JRS/DR/SMS
F. #2021R00129

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

     - against -                           Docket No. 20-CR-293 (S-1) (WFK)

OLUWAGBENGA AGORO, et al.,

              Defendants.

– – – – – – – – – – – – – – – – – –X

GOVERNMENT'S MOTIONS *IN LIMINE* AND MEMORANDUM IN SUPPORT

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Jonathan Siegel
Dana Rehnquist
Sophia Suarez
Assistant U.S. Attorneys
     (Of Counsel)

# Table of Contents

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................ 1

  I.     GD and No Love City.................................................................................... 1

  II.    NLC's Hierarchy .......................................................................................... 3

  III.   The March 14, 2020 Shooting ...................................................................... 5

  IV.    The November 2020 Shootings ..................................................................... 7

         A.   The Theft of the SPMB Chain............................................................ 7

         B.   The November 7 Shootings ............................................................... 12

         C.   The November 8 Car Chase .............................................................. 14

         D.   The November 9 Shootings ............................................................... 15

  V.     The Agoro Robbery and Extortion ............................................................. 16

ARGUMENT ............................................................................................................... 16

  I.     Evidence of Certain Uncharged Crimes and Other Acts Should Be Admitted..... 16

         A.   Applicable Law.................................................................................. 17

         B.   Discussion.......................................................................................... 25

  II.    Case Numbers 20-CR-293 (the Shootings) and 21-CR-166 (the Agoro Robbery)
         Should Be Tried Together ........................................................................... 35

         A.   Applicable Law.................................................................................. 35

         B.   Application......................................................................................... 35

  III.   Various Co-Conspirator Statements are Admissible.................................... 37

         A.   Applicable Law.................................................................................. 37

         B.   Discussion.......................................................................................... 39

  IV.    If A Defendant Testifies, He May Be Cross Examined on His Criminal History  40

A.   Applicable Law .............................................................................. 42

B.   Analysis ......................................................................................... 43

V.   Anonymous Jury ..................................................................................... 50

A.   Applicable Law .............................................................................. 50

B.   Analysis ......................................................................................... 52

VI.   Business and Official Records Certifications ....................................... 56

CONCLUSION ..................................................................................................... 60

# Table of Authorities

## Cases

Bourjaily v. United States,
    483 U.S. 171 (1987)........................................................................................ 39

Crenshaw v. Herbert,
    409 F. App'x 428 (2d Cir. 2011) .................................................................... 47

Georgia v. McCollum,
    505 U.S. 42 (1992).......................................................................................... 55

Jones v. City of New York,
    No. 98 Civ. 6493 (LBS), 2002 WL 207008 (S.D.N.Y. Feb. 11, 2002)............ 42

Jones v. N.Y. City Health & Hosps. Corp.,
    102 F. App'x 223 (2d Cir. 2004) .................................................................... 43

Melendez-Diaz v. Massachusetts,
    557 U.S. 305 (2009)................................................................................ 57, 58

Rosales-Lopez v. United States,
    451 U.S. 182 (1981)........................................................................................ 55

United States v. Alexander,
    48 F.3d 1477 (9th Cir. 1995) ..................................................................... 44, 45

United States v. Amuso,
    21 F.3d 1251 (2d Cir. 1994) ...................................................................... 51, 56

United States v. Arrington,
    867 F.2d 122 (2d Cir. 1989) ........................................................................... 38

United States v. Ashburn,
    13-CR-303 (NGG), 2014 WL 5800280 (E.D.N.Y. Nov. 7, 2014) ................... 52

United States v. Aulicino,
    44 F.3d 1102, 1116 (2d Cir. 1995) ................................................................. 51

United States v. Baez,
    349 F.3d 90 (2d Cir. 2003) ............................................................................. 20

United States v. Barnes,
    604 F.2d 121 (2d Cir. 1979) ...................................................................... 51, 55

United States v. Brown,
    606 F. Supp. 2d 306 (E.D.N.Y. 2009) .......................................................... 42, 43

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000) ........................................................................... 21

United States v. Castro,
    659 F. Supp. 2d 415 (E.D.N.Y. 2009) ............................................................ 20

United States v. Coiro,
    922 F.2d 1008 (2d Cir. 1991) ........................................................................ 21

United States v. Colon,
    880 F.2d 650 (2d Cir. 1989) .......................................................................... 23

United States v. Concepcion,
    983 F.2d 369 (2d Cir. 1992) ..................................................................... 19, 20

United States v. Coonan,
    938 F.2d 1553 (2d Cir. 1991) ........................................................................ 22

United States v. Coppola,
    671 F.3d, 220 (2d Cir. 2012). ....................................................................... 37

United States v. Curley,
    639 F.3d 50 (2d Cir. 2011) ........................................................................... 35

United States v. Daly,
    842 F.2d 1380 (2d Cir. 1988) ........................................................................ 22

United States v. Desena,
    260 F.3d 150 (2d Cir. 2001) ......................................................... 19, 28, 33, 38

United States v. Detrich,
    865 F.2d 17 (2d Cir. 1988) ........................................................................... 28

United States v. Diaz,
    176 F.3d 52 (2d Cir. 1999) ............................................................ 18, 19, 21, 38

United States v. DiNome,
    954 F.2d 839 (2d Cir. 1992) .......................................................................... 20

United States v. Dismuke,
    No. 07-CR-81, 2007 WL 3342548 (E.D. Wis. Nov. 7, 2007) ............................ 45

United States v. Ellis,
    460 F.3d 920 (7th Cir. 2006) ......................................................................... 58

United States v. Estrada,
    430 F.3d 606 (2d Cir. 2005) ................................................................. 42, 44, 45

United States v. Everett,
    825 F.2d 658 (2d Cir. 1987) ............................................................................ 24

United States v. Garcia,
    291 F.3d 127 (2d Cir. 2002) ........................................................................... 23

United States v. Germosen,
    139 F.3d 120 (2d Cir. 1998) ........................................................................... 25

United States v. Gigante,
    166 F.3d 75 (2d Cir 1999) .............................................................................. 29

United States v. Goffer,
    721 F.3d 113 (2d Cir. 2013) ........................................................................... 25

United States v. Gonzalez,
    110 F.3d 936 (2d Cir. 1997) ........................................................................... 22

United States v. Gotti,
    459 F.3d 296 (2d Cir. 2006) ........................................................................... 51

United States v. Gotti,
    777 F. Supp. 224 (E.D.N.Y. 1991). ................................................................ 55

United States v. Guerrero,
    882 F. Supp. 2d 463 (S.D.N.Y. 2011) ........................................................... 34

United States v. Halper,
    590 F.2d 422, 428 (2d Cir. 1978) .................................................................. 35

United States v. Hayes,
    553 F.2d 824 (2d Cir. 1977) ........................................................................... 42

United States v. Inserra,
    34 F.3d 83 (2d Cir. 1994) ............................................................................... 22

United States v. Jefferson,
    215 F.3d 820 (8th Cir. 2000) ..................................................................... 38, 39

United States v. Jimenez,
    214 F.3d 1095 (9th Cir. 2000) ....................................................................... 42

United States v. Johnson,
    688 F.3d 494 (8th Cir. 2012) ......................................................................... 58

United States v. Kadir,
    718 F.3d 115 (2d Cir. 2013) ........................................................................... 50

United States v. Komasa,
    767 F.3d 151 (2d Cir. 2014) ........................................................................... 58

United States v. Langford,
    990 F.2d 65 (2d Cir. 1993) ............................................................................ 22

United States v. Levy,
    731 F.2d 997 (2d Cir. 1984) ........................................................................... 23

United States v. Locascio,
    6 F.3d 924 (2d Cir. 1993) .............................................................................. 51

United States v. Maldonado-Rivera,
    922 F.2d 934 (2d Cir. 1990) ........................................................................... 38

United States v. Matera,
    489 F.3d 115 (2d Cir. 2007) ........................................................................... 18

United States v. Mejia,
    545 F.3d 179 (2d Cir. 2008) ..................................................................... 18, 33

United States v. Mickens,
    926 F.2d 1323 (2d Cir. 1991) ......................................................................... 23

United States v. Miller,
    116 F.3d 641 (2d Cir. 1997) ........................................................................... 21

United States v. Morgan,
    505 F.3d 332 (5th Cir. 2007) .......................................................................... 58

United States v. Ortiz,
    553 F.2d 782 (2d Cir. 1977) ..................................................................... 44, 46

United States v. Ortiz,
    857 F.2d 900 (2d Cir. 1988) ........................................................................... 23

United States v. Paccione,
    949 F.2d 1183 (2d Cir. 1991) ......................................................................... 51

United States v. Payne,
    591 F.3d 46 (2d Cir. 2010) ............................................................................ 19

United States v. Payton,
    159 F.3d 49 (2d Cir. 1998) ................................................................. 43, 44, 46

United States v. Persico,
832 F.2d 705, (2d Cir. 1987) ...................................................................... 39, 59

United States v. Pica,
692 F.3d 79 (2d Cir. 2012) ................................................................................ 51

United States v. Pimentel,
346 F.3d 285 (2d Cir. 2003) ............................................................................. 19

United States v. Pipola,
83 F.3d 556 (2d Cir. 1996) ............................................................................... 24

United States v. Pitre,
960 F.2d 1112 (2d Cir. 1992) ................................................. 22, 23, 24, 34, 36

United States v. Qualls,
613 F. App'x 25 (2d Cir. 2015) ...................................................................... 58

United States v. Quinones,
511 F.3d 289 (2d Cir. 2007) ........................................................................... 51

United States v. Ramirez,
894 F.2d 565 (2d Cir. 1990) ........................................................................... 25

United States v. Rastelli,
870 F.2d 822 (2d Cir. 1989) ........................................................................... 38

United States v. Roldan-Zapata,
916 F.2d 795 (2d Cir. 1990) ........................................................................... 50

United States v. Rosa,
11 F.3d 315 (2d Cir. 1993) ............................................................................. 24

United States v. Saget,
377 F.3d 223 (2d Cir.) .................................................................................... 39

United States v. Salerno,
868 F.2d 524 (2d Cir. 1987) ....................................................................... 38, 39

United States v. Silva,
715 F.2d 43, 50 (2d Cir. 1983) ........................................................................ 55

United States v. Sloman,
909 F.2d 176 (6th Cir. 1990) .......................................................................... 42

United States v. Smith,
131 F.3d 685 (7th Cir. 1997) .......................................................................... 42

United States v. Steele,
   216 F. Supp. 3d 317 (S.D.N.Y. 2016) ................................................................. 47

United States v. Stevens,
   No. 03-CR669 (JFK), 2004 WL 2002978 (S.D.N.Y. Sept. 7, 2004) ................................. 47

United States v. Thai,
   29 F.3d 785 (2d Cir. 1994) ................................................................. 19, 51, 56

United States v. Thomas,
   214 F. Supp. 3d 187 (E.D.N.Y.) ................................................................. 50

United States v. Thomas,
   757 F.2d 1359, 1364-65 (2d Cir. 1985) ................................................................. 51

United States v. Towne,
   870 F.2d 880 (2d Cir. 1989) ................................................................. 22

United States v. Tubol,
   191 F.3d 88 (2d Cir. 1999) ................................................................. 35

United States v. Turkette,
   452 U.S. 576 (1981) ................................................................. 18

United States v. Tutino,
   883 F.2d 1125 (2d Cir. 1989) ................................................................. 51, 56

United States v. Weiland,
   420 F.3d 1062 (9th Cir. 2005) ................................................................. 58

United States v. White,
   No. 08-CR-682 (NGG), 2009 WL 4730234 (E.D.N.Y. Dec. 4, 2009) ................................. 45, 49

United States v. Williams,
   205 F.3d 23 (2d Cir. 2000) ................................................................. 24

United States v. Wilson,
   493 F. Supp. 2d 397 (E.D.N.Y. 2006) ................................................................. 52

United States v. Wong,
   40 F.3d 1347 (2d Cir. 1994) ................................................................. 20, 51

United States v. Yeley-Davis,
   632 F.3d 673 (10th Cir. 2011) ................................................................. 58

**<u>Statutes</u>**

18 U.S.C. § 1959 ............................................................................... 17, 18, 19, 20, 35

18 U.S.C. § 1961 ............................................................................................... 19

**<u>Rules</u>**

Federal Rule of Criminal Procedure 8 ................................................................. 35

Federal Rule of Criminal Procedure 13 ............................................................... 35

Federal Rule of Evidence 401 ............................................................................. 23

Federal Rule of Evidence 403 .................................................................. 17, 23, 34

Federal Rule of Evidence 404(b) .............................. 17, 20, 21, 23, 24, 25, 29, 33

Federal Rule of Evidence 609 ................................................... 42, 43, 44, 45, 47

Federal Rule of Evidence 801 ........................................................... 28, 33, 37

Federal Rule of Evidence 902(11) .................................................................. 58, 59

**<u>Other Authorities</u>**

Sand, et al., <u>Modern Federal Jury Instructions</u>, Instruction 52-36 ......................... 18

PRELIMINARY STATEMENT

The twenty-count superseding indictment in this case arises out of a series of

shootings committed by the defendants as part of their participation in the Folk Nation

Gangster Disciples ("GD" or the "enterprise"), a violent street gang.  In advance of trial,

which is scheduled to begin on October 17, 2022, the government respectfully moves in

limine regarding: (1) the proposed admission of certain uncharged crimes and other acts,

(2) consolidation of case numbers 20-CR-293 (charging the shootings) and 21-CR-166

(charging defendant Oluwagbenga Agoro's use of force in furtherance of extortion), (4) the

cross-examination of certain defendants on their criminal history should they testify at trial,

(5) the anonymity of the jury, and (6) the admissibility of evidence pursuant to business

records certifications.

BACKGROUND

I.      GD and No Love City

GD is a nation-wide criminal enterprise that operates through locally based

subgroups or "sets."  No Love City, or "NLC," is a set of GD based in Flatbush, Brooklyn,

primarily in the area of Newkirk Avenue and Flatbush Avenue.  Members and associates of

NLC use shared symbols of GD and NLC, including black hearts, black bandannas, a three-

pronged pitchfork (also known as the "rake"), the number "74" (representing "G," the

seventh letter of the alphabet and "D," the fourth letter), a six-pointed star and a spiral (also

known as a "twirl").  Members and associates of NLC also commonly use nicknames ending

in "Flocks" or "Floxks."

Since at least 2014, NLC has been engaged in numerous acts of attempted

murder, drug trafficking, trafficking in counterfeit currency, fraud, firearm possession and

other crimes.  All members and associates of GD and NLC are expected to use violence on behalf of the gang.  Using violence increases one's status in the gang and failing to use violence results in a loss of status.

Between 2014 and 2016, NLC was involved in a gang war with rival gang members set off by the murder of NLC-member Malik Bhola, also known as "Rexk" or "Rexkless."  During this period, members and associates of NLC commonly drove in multiple cars to rival gang territory to engage in drive-by shootings.  Ultimately, over a dozen members and associates of NLC were indicted in state court for conspiracy to commit murder — including, as relevant here, defendant Jean Fremont and former defendant Christian Williams and NLC members Paolo Alfarobarber, Dens Marcellus, Javanni Moise and Kwyme Waddell — and were imprisoned for periods of time ranging from a few years to more serious sentences.

As members of NLC were released from prison, the gang continued committing violence, including numerous shootings.  These shootings often targeted areas, not individuals.  For example, in summer 2020, defendant Lorenzo Bailey ordered younger members of the gang to shoot someone in rival gang territory as retaliation for a shooting of a member of NLC.  Bailey and younger members drove to rival territory and one of the younger members shot a random individual without knowing (or caring) whether this individual was, in fact, a rival gang member.  When members of the gang questioned the wisdom of these tactics, they were chastised by gang leaders.

In 2021, for example, in a Telegram conversation, a gang member stated, "I just want n**gas to be smart and not just hitting random people."  Defendant Fremont responded, "You worried bout the wrong things," and "That spot is owned by woos," a rival

2

gang.  GD member Alfarobarber added, "Listen we not about to do this new shyt where we checking to see if they there or not bro they going get the message either way or the other." Later in the conversation, Fremont stated, "You think when rexk [i.e., Malik Bhola] died we cared who got hit it don't matter who gets hit thinking like that is what got n**gas looking soft right now."

II.    NLC's Hierarchy

        The highest ranking member of NLC is Ronald Britton (known as "Cam") who was imprisoned at Fort Dix on a federal robbery conviction for all periods relevant to this case.  While incarcerated, Britton kept in close communication with members of the gang through a contraband phone hidden in his cell.  That phone was found, seized and searched in 2021.

        In one conversation found on Britton's phone, Britton provided rules and a hierarchy for the gang.  Defendants Destine (known as "YL") and Fremont (known as "Juno") were appointed to the gang's five-person steering committee, along with Moise (known as "Bills") and Alfarobarber (known as "Paolo" or "Chico").  Britton appointed defendant Bailey (known as "Renzo") as the "Chief of Security," responsible both for policing violations of the gang's internal rules and for retaliating against rival gang members, and appointed defendant Thompson (known as "Benzo" or "D Benzo") as the Assistant Chief of Security.  A copy of handwritten instructions containing these appointments sent by Britton to Destine is shown below.

Britton also sent Destine an overall hierarchy of the gang, dividing gang members into "Lines," with a group of leaders in charge of each line. For example, Waddell, known as "K" — who was then still in state prison — was in charge of the "Big Gun" line, with Destine (YL), as his second-in-command. A copy of this hierarchy is shown below.

| K BIGGUN | Bills Presidential | Cam 2 P's | Paolo G-18 | Juno |
|---|---|---|---|---|
| YL | Mel | LG | D Benzo | |
| DENZ | Zone | Renzo | Pookie | |
| Sha Murda | | Steely | | |

| | | | | |
|---|---|---|---|---|
| Dajuan | Shyne | Ash | Jashiah | Jrock |
| Dawante | Nate | Sasha | | Slim |
| Polo | Rezzy | T-mac | | |
| Blam | | Izzy | | |
| lil lock | | Ricky | | |
| Mikey | | Sho | | |
| Banga | | Fresh | | |
| Sha Floxk | | JuJu | | |
| Jah | | Shaq | | |
| Cody | | Brisko | | |
| Wal'blick | | Flex | | |
| Freddy | | Tony | | |
| Jody | | Biggz | | |
| Justo | | Trell | | |
| Jose | | DT | | |
| Boss B | | | | |
| DevG | | | | |
| Bishop | | | | |
| Kali | | | | |
| Reesey | | | | |
| Klay | | | | |
| Kdot | | | | |
| Matty | | | | |
| lil Flocko | | | | |
| Swift | | | | |
| Brisk | | | | |

III.   The March 14, 2020 Shooting

On March 14, 2020, several members of GD and NLC were together at a bar, including defendant Brown, former-defendant Christian Williams, defendant Fremont and former-defendant Triston Lawrence.  An argument broke out between a member of the Crips

(a rival gang) and a member of NLC, during which the Crip made a hand gesture disrespectful to GD, known as "dropping the rake."

This argument was particularly problematic for Brown.  Brown was a former Crip himself and friend of the Crip involved in the argument.  Although he had left the Crips to join NLC, he was sometimes viewed with suspicion by fellow GD members and often had to defend his decision to switch gangs and prove his loyalty to GD.  For example, on May 17, 2020, Brown posted on Facebook: "EVERYBODY BE ON MY DICK ABOUT BEING #GD  . . . WHAT ABOUT U CRIPS THAT TURN BLOOD OR JUST DONT JACK YALL SHIT IN JAIL PERIOD AND THEN U GOT THE BLOOD NIKKAS THAT STAY BLOOD JUST BEEN LIKE 4 DIFFERENT HOODS 😭😭LET ME BE GREAT SHEESH . . . I NEVER BEEN NO SUCKER ALWAYS JACKED MY SHIT AND I LET MY NUTS DRAG EVERYWHERE I GO . . . JUST A FRIENDLY REMINDER 🗣️". Similarly, on December 27, 2019, Brown posted on Facebook: "STOP SAYING I USED TO BE CRIP 🙄THAT SHIT DONT BOTHER ME . . . IM ON THE SAME SHIT AND WITH THE SAME NIKKAS I BEEN WITH 😤".

Although Brown initially stayed out of the fight in the bar, he ultimately had to pick a side.  As captured on surveillance video, after the fight spilled outside of the bar, Brown took out a firearm and fired it into the air.  As the fight continued, he conferred with Christian Williams before handing Williams the gun.  Williams then approached the Crip and shot him once in the buttocks before fleeing and throwing the gun.  Both Brown's and Williams's DNA was found on the firearm after it was recovered.

IV.    The November 2020 Shootings

All defendants except Brown are charged with a series of shootings committed on November 7 and November 9, 2020.  As set forth below, these shootings were all intended as retaliation for rival gangs stealing a chain from defendant Fremont.

A.    The Theft of the SPMB Chain

The most publicly prominent member of NLC is Moise, who raps under the stage name "SPMB Bills."  "SPMB," which stands for "Stay Paid Money Burners," is a group largely consisting of members of NLC.  Because of Moise's high profile, he is a frequent target of criticism and attacks by rival gang members, and any slight against him is taken extraordinarily seriously by members and associates of NLC.

Moise has long been associated with two chain necklaces with pendants with the letters "SPMB" on them.  For example, in 2016, Moise posted to Instagram several photographs showing him wearing these necklaces or close up photographs of the pendants.  Examples of these photographs are shown below.



These pendants were also used as the cover art for an album released by Moise titled, "Broken Bones & VS Stones," as shown below.



On June 23, 2020, shortly after his release from prison in connection with his sentence from the state NLC take down, Moise posted a photograph of these pendants to

8

Facebook and referenced the "Broken Bones & VS Stones," album art in the caption, as shown below.



As late as October 2020, Moise posted photographs of himself wearing the two pendants to Facebook, including, for example, the October 23, 2020 post shown below.



Sometime on or before November 1, 2020, however, Moise apparently gave the larger of the two pendants to Fremont.  For example, Fremont was shown wearing the larger pendant and Moise was shown wearing the smaller pendant only in the music video for Moise's song "Whirlwind" (available online at https://www.youtube.com/watch?v=yiAO3X_4h-8), which was posted online on November 1, 2020.[1]  A still image from that music video is shown below.  Fremont is on the right.



Similarly, in the music video for Moise's song "Mr. Miyagi" (available online at https://www.youtube.com/watch?v=GIfooWDwajU), Moise is shown wearing only the

---

[1]     In addition to their different sizes, the two pendants are distinguishable because in the smaller pendant, the letters "SPMB" are diamond encrusted, while in the larger pendant, only the circumference of the pendant is inlaid with diamonds.

smaller pendant (left) while Fremont is shown wearing the larger pendant (right), as shown below.  This video was filmed on November 6, 2020.



At some point between the filming of the "Mr. Miyagi" video on November 6, 2020 and the morning of November 7, 2020, rival gang members stole the SPMB pendant worn by Fremont (hereinafter, the "SPMB Chain").  As discussed on several jail calls among NLC members, individuals in a car pulled up and asked Fremont for directions, and when he approached the car, they snatched the chain off his neck and drove off.

The morning of November 7, 2020, rival gang members began posting photographs of the SPMB Chain with captions meant to mock Moise, the person most closely associated with the chain.  For example, as shown below, an individual with username "Mikey_Bands83" posted a photograph of a close-up of the SPMB Chain with the caption, "N**gas shuldve took the wheel chair to."  This is a mocking reference to the fact that Moise is paralyzed from a shooting and uses a wheelchair.

11



Rival gang members continued mocking Moise and NLC with photographs of the SPMB Chain, and news of the theft spread on social media, YouTube and Reddit.  As the government will prove at trial, numerous members of NLC received messages asking them about the incident or mocking them for the incident, and leaders of NLC circulated images and links of the mocking posts among themselves.

     B.    <u>The November 7 Shootings</u>

At approximately 12:04 p.m. on November 7, 2020, defendant Bailey photographed a picture of a phone showing an image from the "Mikey_Bands83" account — the account that had posted the mocking image of the SPMB Chain shown above — depicting the account owner together with his gang, as shown below.  Location data for this photograph shows that at the time it was taken, Bailey was in the vicinity of the Jeep later used in the drive-by shootings, in Flatbush.



Approximately half an hour later, Bailey apparently turned off his phone. Around the same time, GPS data for the Jeep, video surveillance and cell site data for the other participants in the shootings that day — Battice, Fremont, Thompson and Agoro — show that the Jeep and Agoro (driving his own car) set off for rival gang territory. They first drove to Prospect Park South, and after failing to find targets, drove to Canarsie, where they shot at a group of people. Shortly after the shooting, Battice took a screenshot of the Mikey_Bands83 post about the SPMB Chain, which screenshot was later recovered from his iCloud account.

The convoy then returned to Flatbush before driving back out to rival gang territory in Brownsville. When they found no targets there, the convoy drove back to Canarsie, where they shot into a second crowd of people. As this was occurring, Destine was messaging Thompson with addresses in Prospect Park South, Brownsville and Canarsie — the exact neighborhoods being targeted.

C.    The November 8 Car Chase

The night of November 7, into the early morning of November 8, 2020, Bailey went out partying with three other members of NLC: Devon Cummings, D'Angelo Rook and Ashton Williams. As they drove back and forth between Brooklyn and Manhattan the men had three firearms in the car with them, including two firearms that had been used in the two November 7 shootings described above.

After 3:00 a.m., the men were speeding down Flatbush Avenue when a police officer attempted to stop them. The men sped off, leading the police on a high-speed chase, throwing their guns out the window as they drove. The car eventually crashed. Bailey escaped, but the other three men were arrested. The three guns the men had thrown out the

14

window — including the two used in the shootings — were recovered that night, and a magazine dropped by Bailey as he fled was recovered the next morning.

D.    The November 9 Shootings

After the November 7 shootings, online discussion of the theft of the SPMB Chain continued.  Late on November 7, 2020, Destine sent a photograph of one of the mocking posts to Britton in prison.  The following morning, November 8, 2020, Destine sent messages to Britton stating, "We dont want that to go back to him . . . We dont need social media to know nothing . . . No trace for nothing n**gas gonna die."

Later on November 8, 2020, at approximately 10:18 p.m., Destine sent messages to Agoro stating, "Yo pick 2 n**gas to spin with u its mandatory im not hearing no . . . Or n**gas getting fixed bro . . . N**gas aint violent for shit."  "To spin" means to look for and shoot rival gang members.

The next morning, November 9, 2020, at approximately 7:50 a.m., Agoro responded: "Bro I Wanna Spin I Don't Wanna Be Driving Behind N**gas Like I Don't Go On Drills For That Bro I Could Care Less about Anyone Else You Kno How I'm Moving, Next Time N**gas Go Tell N**gas Don't Call Me For No Follow Up Or Ima Violate."  To "drill" is synonymous with to "spin," i.e., to shoot.  In this message, Agoro is stating that he wants to go out and shoot ("I Wanna Spin") but that this time, he wants to be in the shooter car, not the decoy car, as he had been for the November 7 shootings ("I Don't Wanna Be Driving Behind N**gas Like I Don't Go On Drills For That . . . Next Time N**gas Go Tell N**gas Don't Call Me For No Follow Up").

That day, members and associates of the gang — including Agoro, Destine, Thompson, Hepburn, Lima and Fremont — engaged in two additional shootings.  As with

15

the November 7 shootings, the participants were captured on video, vehicles used in the shootings were tracked with GPS trackers and the individuals' cell sites demonstrate that they were traveling with the cars used in the shootings.

## V.    The Agoro Robbery and Extortion

On March 12, 2021, a member of NLC named Shaking Powell went to a deli in Flatbush and attempted to take items without paying.  An employee of the deli ("John Doe") stopped Powell and an argument broke out, with Powell throwing items in the store until he eventually left.

Two days later, Agoro came to the deli with another member of NLC, Malachi Simms, and approached John Doe.  Agoro told John Doe, in sum and substance, that the deli was in Agoro's territory and that John Doe could not disrespect Agoro's friends.  Agoro then told John Doe to empty his pockets.  When John Doe refused, Agoro brandished a firearm. John Doe handed over his money.  Agoro then stated that he would be back and that from that point on, whatever Agoro took from the store, John Doe would have to pay for it.

As captured on surveillance video, Agoro wore the same pants for this robbery and extortion that he had worn during the November 9, 2020 shootings.  A subsequent search of his home found evidence of all of these crimes.

## ARGUMENT

## I.    Evidence of Certain Uncharged Crimes and Other Acts Should Be Admitted

The government moves to admit certain evidence and acts of the defendants and other members and associates of GD, including: (1) evidence of the defendants' gang membership in and association with GD and NLC; (2) other NLC members' and associates'

16

participation in drug trafficking, firearms possession, attempted murder and other acts of violence related to their gang membership; and (3) evidence of the theft of the SPMB Chain.

The evidence the government seeks to admit is direct evidence because it proves required elements of the charged attempted murders in-aid-of racketeering and assaults in-aid-of racketeering (the "racketeering offenses"), including the existence of the enterprise (the Folk Nation Gangster Disciples), the enterprise's involvement in racketeering activity, the defendants' association, membership and positions in the enterprise, and motivation for the charged racketeering offenses.  The proffered evidence is also necessary to complete the story of the crime on trial and provides necessary context and background for the charged crime.  To the extent any of the proffered evidence does not fit within these categories, the evidence is nonetheless offered for a proper non-propensity purpose under Rule 404(b), i.e., to show the criminal nature of the relationship between the defendants, to establish motive, opportunity, intent, preparation, plan and knowledge with regard to the specific conduct comprising the charged crime.  Finally, the probative value of all of the evidence identified above is not "substantially outweighed" by any prejudicial effect and thus passes the balancing test under Federal Rule of Evidence 403.

A.    Applicable Law

1.    Racketeering Evidence

To prove a violation of Section 1959, the government must prove: (1) the existence of an enterprise engaged in or affecting interstate or foreign commerce; (2) that the enterprise was engaged in racketeering activity; (3) that the defendant had or was seeking a position in the enterprise; (4) that the defendant committed the alleged crime of violence; and (5) that the defendant's general purpose in committing the crime of violence was to maintain

or increase his position in the enterprise.  Sand, et al., <u>Modern Federal Jury Instructions</u>, Instruction 52-36.

      With respect to the first element, 18 U.S.C. § 1959(b)(2) defines "enterprise" as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."  <u>See also</u> <u>United States v. Mejia</u>, 545 F.3d 179, 203 (2d Cir. 2008) (defining "enterprise" in the context of violence in-aid-of racketeering statute as "'a group of persons associated together for a common purpose of engaging in a course of conduct'" (quoting <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981))).  An "enterprise" "must have an existence separate from the series of criminal acts that constitute its racketeering activity."  <u>Id.</u> at 203.  Accordingly, the Second Circuit has expressly approved the admission of other act evidence in the context of a Section 1959 prosecution to prove the existence of the enterprise:

> Where, as here, the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible "to prove an essential element of the RICO crimes charged — the existence of a criminal enterprise in which the defendants participated." [United States v.] Matera, 489 F.3d [115,] 120 [(2d Cir. 2007)] (upholding admission of evidence of uncharged murders).  The evidence was also admissible to show the existence of the conspiracy with which both Appellants were charged.

<u>Id.</u> at 206 (citing <u>United States v. Diaz</u>, 176 F.3d 52, 79 (2d Cir. 1999)); <u>see also</u> <u>Matera</u>, 489 F.3d at 120 (upholding the admission of uncharged murders to prove the existence of the Gambino family); <u>Mejia</u>, 545 F.3d at 206-07 (concluding that the admission of evidence of a prior uncharged shooting was proper because the shooting demonstrated the existence of the

racketeering enterprise and the existence of the conspiracy with which the defendants were charged).

With respect to the second element of Section 1959, "racketeering activity" is defined in 18 U.S.C. § 1959(b)(1) by cross-reference to 18 U.S.C. § 1961, which lists, among other crimes that count as "racketeering activity," narcotics trafficking and any act or threat involving murder.

With respect to the fifth element of Section 1959, the Second Circuit has explained that it may be proved in various ways:

> In order to establish that a crime of violence was committed for the purpose of . . . maintaining or increasing position in a RICO enterprise, the government is required to prove, inter alia, that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise. . . . Self-promotion need not have been the defendant's only, or even his primary, concern, if it was committed as an integral aspect of membership in the enterprise.  United States v. Concepcion, 983 F.2d [369,] 381 [(2d Cir. 1992)].  The motive requirement is thus satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.  Id.

United States v. Thai, 29 F.3d 785, 817-18 (2d Cir. 1994) (some citations omitted); see also United States v. Payne, 591 F.3d 46, 63 (2d Cir. 2010) ("'[T]he motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" (quoting United States v. Pimentel, 346 F.3d 285, 295-96 (2d Cir. 2003)); United States v. Desena, 260 F.3d 150, 155 (2d Cir. 2001); Diaz, 176 F.3d at 95; Concepcion, 983 F.2d at 381.

19

Under <u>Thai</u> and its progeny, the nature of the charged enterprise, the rules and structure of that enterprise, and the expectations of membership are all relevant to proving whether a defendant committed a violent crime with the purpose of "maintaining or increasing position" within the enterprise.  <u>See, e.g.</u>, <u>United States v. Castro</u>, 659 F. Supp. 2d 415, 421 (E.D.N.Y. 2009) (concluding in Section 1959 prosecution that evidence of an uncharged shooting was admissible to prove the motive for a charged shooting where the motive behind both shootings was to "harm members of rival gangs").

2.      <u>Other Acts as Direct Evidence of the Charged Crime</u>

Although Fed. R. Evid. 404(b) generally governs the admission of evidence regarding a defendant's other crimes, wrongs or acts, "[i]t is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."  <u>United States v. Baez</u>, 349 F.3d 90, 93 (2d Cir. 2003).  In other words, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy [] is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged."  <u>Concepcion</u>, 983 F.2d at 392.  Therefore, crimes committed in furtherance of a racketeering enterprise are admissible as direct evidence of an enterprise or conspiracy, without regard to Rule 404(b).  <u>United States v. DiNome</u>, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of uncharged murders admissible to prove relationship and continuity of RICO enterprise's illegal activities).

The Second Circuit's opinion in <u>United States v. Wong</u>, 40 F.3d 1347 (2d Cir. 1994), is particularly instructive.  In <u>Wong</u>, the Second Circuit held that the district court properly admitted testimony of an uncharged shootout between rival gangs.  In affirming the district court's ruling, the Second Circuit reasoned as follows:

20

> [T]he evidence [of uncharged acts] was admissible to prove the existence and nature of the Green Dragons "enterprise" and the participation of defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b). The court determined that although other evidence had been admitted regarding the defendants' violent conduct, the challenged evidence was not cumulative because "there is no piece of evidence that the government has proffered that I do not expect will be subject to challenge, if not here during the evidentiary phase of the trial, [then] during summations of counsel."

Id. at 1378. The Second Circuit held that "this evidence was probative of the existence, organization and nature of the RICO enterprise, a central allegation in the indictment." Id. Therefore, "'the fact that it may also have been probative of a separate uncharged crime is irrelevant.'" Id. (quoting United States v. Coiro, 922 F.2d 1008, 1016 (2d Cir. 1991)); see also Diaz, 176 F.3d at 79 (affirming admission of numerous uncharged criminal acts admitted as "enterprise evidence," i.e., to establish the existence of the charged enterprise, including evidence of drug trafficking, possession of weapons, assaults in aid of racketeering, robbery and related acts of violence and determining that the evidence was not subject to Fed. R. Evid. 404(b)); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (affirming admission of uncharged murders as proof of racketeering enterprise and conspiracy, rather than pursuant to Rule 404(b)).

It is also well-established that "'evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting

United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); see also United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (same).

Moreover, the Second Circuit has repeatedly upheld the admission of other act evidence as direct evidence of the charged crimes where such evidence provides necessary background or context for the charged crimes. See Gonzalez, 110 F.3d at 942 (uncharged burglary admissible in trial for felon in possession of a firearm because, inter alia, it provided "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of defendants' arrest); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed."). In this respect, "trial court[s] may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).

3.      Rule 404(b) Evidence

In the alternative, evidence of uncharged crimes and other acts may be

admitted pursuant to Rule 404(b) for numerous permissible purposes, including to prove

motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or

accident.  Fed. R. Evid. 404(b)(2).  See United States v. Ortiz, 857 F.2d 900, 903 (2d Cir.

1988).  The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and

liberal application, and applies an "inclusionary approach" to admitting "other acts" evidence

under Rule 404(b).  See United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (citing

United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992)); see also United States v. Levy,

731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive approach

to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

A party must satisfy three requirements for evidence of "other crimes, wrongs

or acts" to be admitted under the Rule.  First, the evidence must be offered for a purpose

other than to prove the defendant's bad character or criminal propensity.  See United States

v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991) (citing United States v. Colon, 880 F.2d 650,

656 (2d Cir. 1989)).  Such permissible purposes include to prove motive, opportunity, intent,

preparation, plan, knowledge, identity or absence of mistake or accident.  Fed. R. Evid.

404(b)(2).  Second, the evidence must be relevant under Rules 401 and 402 and more

probative than prejudicial in accordance with Rule 403.  See Mickens, 926 F.2d at 1328

(citing Ortiz, 857 F.2d at 903); Levy, 731 F.2d at 1002.  Third, if the defendant requests that

the jury be instructed as to the limited purpose for which the government's evidence is being

admitted, the court must furnish such an instruction.  See Mickens, 926 F.2d at 1328-29;

Levy, 731 F.2d at 1002.

The Second Circuit has repeatedly held that evidence of uncharged crimes may be admitted at trial under Rule 404(b) to establish the existence and development of a criminal relationship between coconspirators.  See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding admission of evidence relating to the defendant's prior criminal activities with coconspirators in charged drug conspiracy as relevant evidence "to inform jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed"); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that evidence of co-defendants' prior dealings over  a 14-year period, which included the commission of stolen property and narcotics offenses, "was properly admitted to explain how the illegal relationship between the two [defendants] developed and to explain why [one defendant] . . . appointed [the other defendant] . . . to a leading position in the [narcotics] Organization"); Pitre, 960 F.2d at 1119 ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").

Other acts evidence is also admissible under Rule 404(b) to "corroborate crucial prosecution testimony" if the corroboration is "direct and the matter corroborated is significant," United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (internal quotation marks omitted).

24

Finally, acts that occurred <u>after</u> the charged conduct are also admissible under Rule 404(b).  <u>E.g.</u>, <u>United States v. Goffer</u>, 721 F.3d 113, 124 (2d Cir. 2013) ("Subsequent acts are frequently probative as to intent"); <u>United States v. Germosen</u>, 139 F.3d 120, 128 (2d Cir. 1998) ("The fact that the evidence involved a subsequent rather than prior act is of no moment.  'Subsequent act' evidence may be admitted under Rule 404(b)."); <u>United States v. Ramirez</u>, 894 F.2d 565, 569 (2d Cir. 1990) ("Relevancy cannot be reduced to mere chronology; whether the similar act evidence occurred prior or subsequent to the crime in question is not necessarily determinative to its admissibility.").

B.    <u>Discussion</u>

1.    <u>The Evidence of the Defendants' Gang Affiliation and Association with GD Members Is Admissible</u>

At trial, the government expects to introduce evidence concerning the structure and hierarchy of GD and the defendants' association with and membership in the gang.  This evidence will be introduced in various manners including through photographs and videos of members and associates of GD together, social media postings, YouTube videos, and communications between members and associates of GD.

Evidence admitted at trial, including through evidence retrieved from a phone belonging to NLC-leader Britton will also lay out the hierarchy and organization of the enterprise.  Specifically, messages and photographs from Britton's phone will show that Destine, Fremont and Moise are members of the set's five-person "Steering Committee," a group of the top leaders of the set; Bailey acted as the set's "Chief of Security," responsible both for policing violations of the gang's internal rules and for retaliating against rival gang members; and Thompson served as the "Assistant Chief of Security" under Bailey.

25

At trial, the government will introduce social media records for the defendants in which the defendants use both the phrases and symbols of GD to signify their membership and association with the gang. Social media posts also show that the defendants are associated with one another through their social media connections, interactions and photographs. For example, the vanity name for Destine's Facebook account is "YL Flocks." The bio section for Fremont's Instagram account includes both the twirl and black heart emojis. Evidence from Battice's Facebook account will show that Battice is Facebook friends and in numerous photographs with members and associates of GD and NLC, including Fremont, Bailey, Thompson and Moise.

In addition to the social media posts, which show the defendants' membership and association with GD, the association of the defendants and their loyalty to GD will also be presented through the admission of multiple YouTube videos that are posted publicly online and have been produced in discovery. These YouTube videos include music videos by defendant Davon Brown ("Shoot Up the Party" available online at https://www.youtube.com/watch?v=dO30t5h66Ys), Moise ("The Intro" available online at https://www.youtube.com/watch?v=7xstDoJ29bU; "Controversy" available online at https://www.youtube.com/watch?v=6Menj2waYWs; "Whirlwind" available online at https://www.youtube.com/watch?v=yiAO3X_4h-8; "Mr. Miyagi" available online at https://www.youtube.com/watch?v=GIfooWDwajU; and "Switch on Glee" available online at https://www.youtube.com/watch?v=_46SLyA-9OQ) and Christian Williams ("Twirl Story" available online at https://www.youtube.com/watch?v=uAky7JXrl_g; "Ambition" available online at https://www.youtube.com/watch?v=ksRAovp8xWk; "Dance with Me"

available online at https://www.youtube.com/watch?v=RCwvIKiXYZU;  and "FTO"

available online at https://www.youtube.com/watch?v=AlnZFhmxvCk).  In these music

videos, the defendants are shown using hand gestures associated with GD, including

"throwing the rake" and "dropping the woo," waving a black bandana, and dancing the "twirl

dance" — all actions that are symbols and gestures that members and associates of GD use to

signify their membership and association with the gang.  Lyrics in the music videos also

commonly reference GD.  For example, in the music video for Moise's song "Controversy,"

the song opens with a female voice saying, "Sounds like twirl music," and then a male voice

stating, "Twirl with us," and "SP" (short for  As discussed above, "Twirl" and "SP" are both

terms associated with GD and NLC.  At one point during the song, Moise raps, "GD, throw it

up when I say it."  When he sings this lyric, he displays a hand gesture intended to look like a

pitchfork (i.e., throwing the rake).

These music videos also show the association among the defendants.

Defendants Thompson, Fremont, Destine, Brown, Bailey, Lima and Agoro and GD members

and associates, Moise, Alfarobarber, Marcellus, Apollon and Christian Williams all appear in

several of the music videos.  For example, in the music video for Moise's song "Mr.

Miyagi," defendants Fremont, Bailey, Agoro, Destine and Lima are featured in the video,

along with other members and associates of GD.  (In this video, Bailey and Destine also wear

the same clothing they later wear at the shootings.)  Throughout the Mr. Miyagi video,

individuals are shown using hand gestures and dances that signify their membership and

association with GD.

In addition to the music videos identified above, the government plans to admit other YouTube videos in which GD members discuss GD, thereby corroborating the existence of the enterprise. Specifically, Moise gave an interview (available online at https://www.youtube.com/watch?v=yaXQqBckY_I) in which he discusses SPMB ("stay paid money burner") and twirl ("the winner's in real life"). In another interview posted on YouTube, Dens Marcellus (available at https://www.youtube.com/watch?v=SVmtqcTE7p8) admits that he became a member of GD in 2012 and refuses to address the topic of the stolen SPMB Chain when asked about it. Relatedly, the government intends to introduce statements made by Agoro that establish the existence of the enterprise. Specifically, when Agoro was arrested in relation to the instant matter, he was interviewed by the U.S. Marshals Service. During the interview, Agoro was asked by the Marshals if he was a member of a gang, to which Agoro replied, "No Love City."

The proffered evidence should be admitted because it proves the required elements of the charged racketeering offenses. The evidence demonstrates the existence of the enterprise — GD and NLC — by showing relationships among members and associates of the gang who are engaged in these activities together.[2] This evidence is also admissible

---

[2]     The statements made by Agoro, Marcellus and Moise are offered for non-hearsay purposes and are thus admissible. First, Agoro's statement that he is a member of "No Love City" is an opposing party's statement and therefore admissible against Agoro himself. See Fed. R. Evid. 801(d)(2) (requiring the statement to be "offered against an opposing party"). Agoro's statement is further admissible against all defendants since it is not being offered for the truth of the matter — that Agoro is in fact a member of No Love City — but to corroborate that "No Love City" exists. United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988). Similarly, Marcellus and Moise's statements about the gang are admissible against all defendants, not for the truth that Marcellus and Moise are members of the gang, but as co-conspirator statements, made in furtherance of the conspiracy — to perpetuate the notoriety of the gang and its members. See United States v. Desena, 260 F.3d

under Rule 404(b) to establish the existence of the relationship between co-conspirators, and to explain the relationship between the numerous participants involved in the shootings that took place on November 7 and 9, 2020.

    2.    <u>The Evidence of Other GD Members' and Associates' Involvement in Uncharged Crimes Is Also Admissible at Trial</u>

The government intends to introduce evidence of criminal acts committed by GD members and associates — including drug trafficking, firearms possession, fraud, and trafficking in counterfeit currency and violence — related to their gang membership.

Evidence of GD members and associates other than the charged defendants participating in drug trafficking, trafficking in counterfeit currency, fraud, and non-fatal shootings and other acts of violence related to their gang membership should be admitted because it proves the required elements of the charged attempted murder and assaults in-aid-of racketeering.  Evidence of these crimes demonstrates the existence of GD by showing relationships among members and associates of the gang who are engaged in these activities together.  The proffered evidence also demonstrates that GD was engaged in racketeering activity and used attempted murder and assault to enhance the enterprise's prestige and protect and expand the enterprise's criminal operation and drug trafficking, trafficking in counterfeit currency and fraud as means of obtaining money, as alleged in the Indictment. <u>See</u> Indictment ¶ 6,7.

---

150, 157-58 (2d Cir. 2001) (quoting <u>United States v. Gigante</u>, 166 F.3d 75, 82 (2d Cir 1999)).

Moreover, evidence that the defendants possessed firearms is relevant to showing their access to firearms and to corroborate the government's argument that the defendants were members and associates of a violent criminal enterprise.

3.   Evidence Related to the Theft of the SPMB Chain Is Admissible

At trial, the government intends to admit evidence concerning the theft of the SPMB Chain, which served as the motivation for the November 7 and 9, 2020 shootings.

As mentioned above, Moise, also known as "SPMB Bills," is the most publicly prominent member of NLC.  He frequently appeared on social media wearing these chains, and the two chains were featured as the album art for one of his rap albums.

On the morning of November 7, 2020, rival gang members began posting photographs and videos of the stolen chain.  In addition to the posts by the "mikey_bands83" account, an individual posted a video on YouTube with the title "SPMB BILLS GETS HIS CHAIN SNATCHED" (available online at https://www.youtube.com/watch?v=g3JUxNFpVto).  The video consisted of the same image posted to the "mikey_bands83" account with the additional text added stating, "N**gas took @spmb_bills chain."  On November 7, 2020, an individual made a post to Reddit, an internet chat board, with the title "Opps stained SPMB bills chain" and the subtitle "They left him with his wheelchair at least."  On or before November 8, 2020, the user of an Instagram account with username "gthrilla_dfa" posted an image of the larger SPMB pendant, which was most recently worn by Fremont, with the text "TALK NOW WHO WANT THIS TALT TO ME NICE."

These posts were circulated on YouTube and discussed on Reddit with speculation that Moise or Marcellus had been robbed of the chain and were meant to taunt

Moise and other GD members.  Over the course of November 7 and 8, individuals sent photographs of the chain to Moise, Destine and Fremont over social media, asking them what was going on.

On November 10, 2020, an individual who uses the online pseudonym "UpperClass" posted a video on YouTube titled "What Really Happened To SPMB Bills Chain - Upper Cla$$ Reaction" (available online at https://www.youtube.com/watch?v=KkBNtrC6v5w).  In this video, UpperClass discusses the rumors of Moise's necklace being stolen and notes how others are displaying the necklace online.  In this video, UpperClass says that various versions of the rumors state that the necklace was stolen from Moise directly, or from Marcellus, also known as "Denz Flocks." UpperClass states, however, that he has been informed that Moise had sold the necklace to another person and that the necklace was stolen from that person by individuals in a car.  On November 11, 2020, Destine sent a clip of the UpperClass video to Thompson, to which Thompson responded, "Smh [shaking my head] soon check that."

A video was also posted on YouTube titled "Denz flocks address SPMB BILLS chain getting snatched..says carnasie woods are fake" (available at https://www.youtube.com/watch?v=_lCwmZzckKk ).  The video contains a live Instagram story from user "denzflockz" in which Marcellus orally responded to real-time comments concerning the purported theft of the SPMB Chain.  For example, the user of an Instagram account with username "lean_and_chill" wrote, "Son got his chain snatched in a second" and "Upper class told us the truth" (referring to the November 10, 2020 video discussed above). Marcellus responded saying, "me and my n**gas never got no chain snatched, ever, you

fucking stupid?"  Marcellus continued, "I know the chain is not here no more, whoever got it

cool, but y'all n\*\*gas didn't snatch nothing."

On November 15, 2020, Agoro (who had been arrested for the first

November 9, 2020 shooting) called an NLC member named Gianni Nelson on a recorded jail

call.  In this discussion, Agoro stated that the motivation for the shootings had been the theft

of the SPMB pendant from Fremont:

| | |
|---|---|
| AGORO: | They was watching me from Monday [November 9, 2020].  Feel me?  They wanted to book me from Monday.  But then n\*\*ga then I just started doing mad shit.  So they sat down and watched me for that whole week and just and they was waiting for me to just, they was waiting for me to blow shit up n\*\*ga you feel me bro and n\*\*ga that's wut I went to go do n\*\*ga blow shit up cause you know bro's chain got snatched I don't know if you know about that feel me? |
| Nelson: | Oh I don't know.  Yea yea yea yea the, the uh SP chain [i.e., the SPMB pendant]. |
| AGORO: | Yea bro n\*\*ga feel me?  So n\*\*gas . . . |
| Nelson: | Denz? [Dens Marcellus] |
| AGORO: | Huh? |
| Nelson: | Denz got his shit snatched? |
| AGORO: | You know Denz got no SP chain n\*\*ga that's Juno [i.e., Fremont] chain n\*\*ga. |
| Nelson: | I knew it was Juno I didn't want, I didn't want to make it seem like it but . . . |
| AGORO: | N\*\*ga that . . . |
| Nelson: | Big hommie twirl? |
| AGORO: | Huh? |
| Nelson: | The big homie twirler got his shit took? |

32

AGORO:      Yea son I ain't gonna front he dead but it was on some pussy
            n\*\*ga shit.  Like n\*\*gas pulled up trying to ask for directions
            and snatched it off his neck and drive off.

The evidence of the story of the theft of the SPMB Chain is proof of the

defendants' motive for the charged attempted murder and assaults — a required element in

proving attempted murder and assault in-aid-of-racketeering.  See Mejia, 545 F.3d at 203.

The proffered statements and social media postings discussing the theft of the SPMB Chain

and the related taunting of Moise and other GD members because of the theft are critical to

understanding the feud between GD and rival gang members and thus provides both direct

evidence of defendants' motive in driving to opposition territory to engage in the retaliatory

shootings and provides necessary background and context to the crime.[3]  This evidence

therefore should be admitted.

In the alternative, this same evidence is admissible pursuant to Rule 404(b) for

several purposes.  First, the expected testimony, social media evidence, YouTube videos and

the jails calls during which the defendants and others discuss the purported theft of Moise's

pendant is being offered as to the defendants' motive to engage in the shootings that took

place on November 7 and 9, 2020 — namely, to seek revenge on rival gang members who

either stole Moise's pendant or were circulating rumors that Moise's pendant as stolen in an

---

[3]     These statements are all introduced for non-hearsay purposes and thus
admissible.  Third-party conversations discussing the theft of the SPMB Chain are not being
introduced for the truth of the matter — that the chain was actually stolen — but to show that
news of the theft was being used to mock Moise and members of NLC.  See Fed. Rule Evid.
801(c)(2).  Similarly, statements by co-conspirators reacting to these allegations are
admissible as co-conspirator statements, present sense impressions, excited utterances and to
show the declarant's then existing state of mind.  See Fed. Rule Evid. 803; United States v.
Desena, 260 F.3d 150, 157-58 (2d Cir. 2001).

effort to taunt Moise and other GD members.  See Fed. R. Evid. 404(b)(2) (providing that motive is one of the proper uses of "other acts" evidence).  Additionally, as indicated above, the evidence is offered "to explain the development of the illegal relationship between the defendants and their co-conspirators and explain the mutual trust that existed between the coconspirators."  United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).  The conversations the defendants had about the purported theft of Moise's pendant provides direct proof of the relationships among the defendants, as well as with their co-conspirators and other gang members.

4.    The Probative Value of the Proffered Evidence Far Outweighs Any Prejudicial Effect

Each of the above categories of proffered evidence is highly relevant and probative of the charged crimes, and the defendants will not be unfairly prejudiced by the admission of such evidence.  There is accordingly no basis to exclude the evidence under Federal Rule of Evidence 403.  Specifically, because the proffered evidence does "not involve conduct any more sensational or disturbing" than the offenses charged, Pitre, 960 F.2d at 1120, there is no risk of unfair prejudice with respect to that evidence.

As explained above, the evidence the government seeks to admit is highly probative because it is direct evidence demonstrating the existence of the charged enterprise, the defendants' positions within the enterprise, the fact that the enterprise was engaged in racketeering activity, the rivalry between GD and other gangs, and the defendants' motive for conducting the shootings, i.e., to maintain or increase their position in the enterprise.  Furthermore, the admission of the proffered evidence would not result in any unfair prejudice, let alone unfair prejudice that substantially outweighs the probative value of the

34

evidence.  See United States v. Curley, 639 F.3d 50, 57 (2d Cir. 2011) (noting that for

evidence to be unfairly prejudicial under Rule 403, it must "tend[ ] to have some adverse

effect upon a defendant beyond tending to prove the fact or issue that justified its admission

into evidence").  Moreover, the jury could be given an appropriate limiting instruction to

minimize any potential unfair prejudice, and the government does not oppose such an

instruction.

II.     Case Numbers 20-CR-293 (the Shootings) and 21-CR-166 (the Agoro Robbery)
        Should Be Tried Together

        A.      Applicable Law

                Under Fed. R. Crim. P. 13, a "court may order that separate cases be tried

together as though brought in a single indictment or information if all offenses and all

defendants could have been joined in a single indictment or information."  "For this

determination, reference is necessarily made to" Fed. R. Crim. P. 8, which governs which

cases may be joined in an indictment.  United States v. Halper, 590 F.2d 422, 428 (2d Cir.

1978).  Under that rule, offenses may be joined "if the offenses charged . . . are of the same

or similar character, or are based on the same act or transaction, or are connected with or

constitute parts of a common scheme or plan."  This standard is met and "[j]oinder is proper

where the same evidence will support both of the joined counts."  United States v. Tubol,

191 F.3d 88, 95 (2d Cir. 1999).

        B.      Application

                Even absent joinder, evidence of Agoro's robbery and extortion would be

admissible in Case No. 20-CR-293 because it proves the essential element of 18 U.S.C.

§ 1959 that GD was involved in the racketeering acts, specifically robbery and extortion, as

specifically alleged in the indictment in Case No. 20-CR-293.  Agoro's assertion that NLC-member Powell had the right to steal from the deli, his coordinated conduct with NLC-member Simms, and Agoro's claims to John Doe that the deli was in his territory are also all evidence that proves the existence of the enterprise.

Moreover, the same evidence is admissible to prove both sets of crimes. Agoro wore the same distinctive pants during the November 9, 2020 shootings and the robbery.  One search of his apartment found evidence of both sets of crimes.  Combining the cases into one trial would therefore result in substantial judicial economy by avoiding unnecessary duplication of efforts and avoiding the need to call the same witnesses twice for two different trials.

Nor is the joinder of the cases likely to prejudice any of the defendants. Because the underlying conduct is separate, there is no realistic risk that a juror would believe that Agoro is more likely to have committed the robbery and extortion because of the shootings, or that a juror would conclude that any of the defendants was more likely to have committed the shootings because Agoro committed robbery and extortion.  See Pitre, 960 F.2d at 1120.  (To the extent that evidence of Agoro's conduct suggests the existence of a criminal enterprise, that is not prejudicial, but appropriate probative evidence of Section 1959's elements.)

Notably, the Court has held joint status conferences in the two cases from the very beginning.  The government has also jointly produced discovery from both cases to all defendants from the beginning.  No defendant has ever suggested that treating these two cases as one case is inappropriate or has questioned whether the two cases would ultimately be tried together.

The two cases should therefore be joined for a single trial.

III.   Various Co-Conspirator Statements are Admissible

As mentioned above, at trial the Government intends to introduce statements made by other participants in the shootings and other co-conspirators not on trial made during and in furtherance of various charged and uncharged conspiracies.   Such statements are expected to include, but are not limited to: (1) messages concerning the existence of the enterprise and the motive and execution of the shootings and (2) statements made by GD gang members concerning the purported theft of the SPMB (including through Agoro's and others' jail calls and social media postings).  As a practical matter, the Government anticipates that the context in which the co-conspirator statements are offered at trial will make clear that the statements were made during and in furtherance of the conspiracy.

A.   Applicable Law

1.   Co-Conspirator Statements: Rule 801(d)(2)(E)

Rule 801(d)(2)(E) excludes from the definition of hearsay "statement[s] by a co-conspirator of a party during the course and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  To admit a statement under Rule 801(d)(2)(E), a court must find only by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy."  United States v. Coppola, 671 F.3d, 220, 246 (2d Cir. 2012).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of a then-ongoing conspiracy.

37

Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, see United States v. Desena, 260 F.3d at 158; (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," Desena, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," id.; (5) "serve to foster trust and cohesiveness," id.; (6) "facilitate and protect" the conspiratorial activities, United States v. Diaz, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a coconspirator of "the identity and activities of his coconspirators," United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989).

Statements apprising co-conspirators of past events also often further the conspiracy.  See, e.g., United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) ("Statements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." (internal quotation marks omitted)); United States v. Salerno, 868 F.2d 524 (2d Cir. 1987) (statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators).  Even after members of a conspiracy have committed crimes leading to the arrest of many of its members, "the conspiracy does not necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise terminated."  United States v. Arrington, 867 F.2d 122, 130 (2d Cir. 1989) (admitting co-conspirator statements made after conspirators were arrested and incarcerated).  Thus, imprisoned members of a conspiracy can continue to make statements in furtherance of the conspiracy in order to "update" members "on the current status of the conspiracy" and inform them about "the identity and

38

activities of . . . co-conspirators." United States v. Persico, 832 F.2d 705, 716 (2d Cir. 1987).  Where co-conspirator statements are non-testimonial, there is no Confrontation Clause concern in the admission of co-conspirator statements.  See United States v. Saget, 377 F.3d 223, 228-30 (2d Cir.), supplemented, 108 F. App'x 667 (2d Cir. 2004) (analyzing Bourjaily v. United States, 483 U.S. 171 (1987), identifying as testimonial "a declarant's knowing responses to structured questioning in an investigative environment or in a courtroom setting where the declarant would reasonably expect that his or her responses might be used in later judicial proceedings.").

B.   Discussion

The proffered co-conspirator statements will principally be offered in the form of conversations that were retrieved from the searches of various cellphones including cellphones belonging to Britton, Agoro, Fremont, Bailey, Battice and Thompson.  These conversations will evidence the existence of the enterprise and the motive for the November 7 and 9, 2020 shootings and as such are indisputably in furtherance of the conspiracy.

Additionally, as mentioned above, there are numerous conversations by co-conspirators regarding the theft of the SPMB, all of which are offered for non-hearsay purposes and thereby admissible.  For example, Agoro was captured on a recorded jail call discussing the theft of the SPMB Chain with another GD member.  These statements are admissible as they kept conspirators "abreast of current developments and problems facing the group," Jefferson, 215 F.3d at 824, and "brief[ed] coconspirators," Salerno, 868 F.2d 524, 535-37.

IV.    If A Defendant Testifies, He May Be Cross Examined on His Criminal History

      If a defendant discussed herein testifies, the government seeks to cross-examine him about certain prior felony convictions.  The prior felony convictions of the defendants are as follows:

- Bailey

  - On January 13, 2015, Bailey was convicted following a guilty plea of bail jumping in the second degree, a felony in violation of N.Y.P.L. § 215.56, and sentenced to 18 months' to 3 years' imprisonment.

  - On January 13, 2015, Bailey was convicted following a guilty plea of possession of a forged instrument, a felony in violation of N.Y.P.L. § 170.25, and sentenced to two to four years' imprisonment.

  - On August 17, 2011, Bailey was convicted following a guilty plea of assuming another's identity, a felony in violation of N.Y.P.L. § 190.79, and sentenced to five years' probation.

- Battice

  - On March 5, 2018, Battice was convicted following a guilty plea of conspiracy to manufacture and utter counterfeit obligations of the United States, a felony in violation of 18 U.S.C. §§ 471, 472 and 371, and false statements, a felony in violation of 18 U.S.C. § 1001, and sentenced to 30 months' imprisonment.

  - On June 1, 2016, Battice was convicted following a guilty plea of access device fraud, a misdemeanor in violation of 18 Pa. C.S.A. § 4106(a)(3), and furnishing law enforcement with false identification information, a misdemeanor in violation of 18 Pa. C.S.A. § 4914(a), for which he received a fine.

  - On June 23, 2015, Battice was convicted following a guilty plea of attempted grand larceny, a felony in violation of Va. Code § 18.2-95, and felony eluding police, in violation of Va. Code § 46.2-817(B), and sentenced to five years' imprisonment on each count.

  - On February 6, 2008, Battice was convicted following a guilty plea of robbery in the first degree, displaying what appears to be a firearm, a

felony in violation of N.Y.P.L. § 160.15, and sentenced to five years' imprisonment.

- Brown

  - On October 13, 2017, Brown was convicted following a guilty plea of bad checks, a felony in violation of N.J. Rev. Stat. § 2C:21-5, and sentenced to 67 days' imprisonment.

  - On April 21, 2017, Brown was convicted following a guilty plea of petit larceny, a misdemeanor in violation of N.Y.P.L. § 155.25, and sentenced to time served.

  - On April 5, 2016, Brown was convicted following a guilty plea of racketeering conspiracy, in which Brown admitted to his participation in a scheme to defraud numerous banks, a felony in violation of 18 U.S.C. § 1962(d) and 1963(a), and sentenced to 41 months' imprisonment.

  - On July 17, 2014, Brown was convicted following a guilty plea of possession of a forged instrument in the third degree, a misdemeanor in violation of N.Y.P.L. § 170.20, and sentenced to 60 days' imprisonment.

- Fremont

  - On November 6, 2017, Fremont was convicted following a guilty plea of criminal possession of a weapon in the fourth degree, a misdemeanor in violation of N.Y.P.L. § 265.01, and sentenced to time served.

  - On May 4, 2017, Fremont was convicted following a guilty plea of conspiracy in the fourth degree, a felony in violation of N.Y.P.L. § 105.10(1), and sentenced to one to three years' imprisonment.

  - On May 4, 2017, Fremont was convicted following a guilty plea of attempted criminal possession of a weapon in the second degree, possession of a loaded firearm other than in a person's home or business, a felony in violation of N.Y.P.L. § 265.03, and sentenced to three years' imprisonment.

Should defendant Bailey, Battice, Brown or Fremont elect to testify at trial, the government would seek to introduce evidence of his prior convictions as set forth above during cross-examination.

A.    Applicable Law

Federal Rule of Evidence 609 governs the admissibility of evidence of prior

convictions for impeachment purposes.  As relevant here, if the witness is a criminal

defendant, evidence of a prior felony conviction is admissible "if the probative value of the

evidence outweighs its prejudicial effect to that defendant."  Fed. R. Evid. 609(a)(1)(B).

Under Rule 609(a)(1), the "evidence" of prior convictions that may be admitted includes "the

essential facts of a witness's convictions, including the statutory name of each offense, the

date of conviction, and the sentence imposed."  United States v. Estrada, 430 F.3d 606, 615

(2d Cir. 2005); see also United States v. Brown, 606 F. Supp. 2d 306, 315-16 (E.D.N.Y.

2009) (same).

In weighing the probative versus prejudicial value of impeaching a defendant

with a prior conviction, courts generally consider five factors: (1) the impeachment value of

the prior crimes; (2) the date of the convictions and the defendant's subsequent history;

(3) the degree of similarity between the past crimes and the charged crime, with dissimilarity

favoring admission; (4) the importance of the defendant's testimony; and (5) the centrality of

the credibility issue.  See United States v. Hayes, 553 F.2d 824, 828 (2d Cir. 1977); see also

United States v. Jimenez, 214 F.3d 1095, 1098 (9th Cir. 2000); United States v. Smith, 131

F.3d 685, 687 (7th Cir. 1997); United States v. Sloman, 909 F.2d 176, 181 (6th Cir. 1990);

Jones v. City of New York, No. 98 Civ. 6493 (LBS), 2002 WL 207008, at *2 (S.D.N.Y.

Feb. 11, 2002).

If the later of the date of conviction or the date of the defendant's release from

confinement for that conviction is more than ten years old, then, pursuant to Rule 609(b),

evidence of the conviction is admissible only if "its probative value, supported by specific

42

facts and circumstances, substantially outweighs its prejudicial effect" and the party seeking to offer it gives the opposing party reasonable written notice of its intent to use the evidence. Courts apply the same balancing test as that prescribed by Rule 609(a), but the heightened standard of Rule 609(b) requires that the evidence have more probative value than that required under Rule 609(a). See Brown, 606 F. Supp. 2d at 313. In addition, under Rule 609(b), a court must "make an on-the-record finding based on specific facts and circumstances that the probative value of the evidence substantially outweighs the danger of unfair prejudice." Jones v. N.Y. City Health & Hosps. Corp., 102 F. App'x 223, 226 (2d Cir. 2004) (summary order); see also United States v. Payton, 159 F.3d 49, 57-58 (2d Cir. 1998) (upholding district court's decision to admit defense witness's 13-year-old convictions where court specifically found that witness's "credibility was 'crucial' because she would be testifying in direct contradiction to the government's witnesses on the key element of possession of the .38 caliber revolver; the impeachment value of her convictions was substantial; and the government provided defendant with sufficient advance notice of its intent to use these convictions in her cross-examination").

      B.    <u>Analysis</u>

        Should a defendant testify, the government expects he will generally deny the charge, or charges, against him, namely his involvement in the charged enterprise and the shootings. If so, such testimony would directly contradict the testimony of government witnesses as well as other evidence. This would squarely place before the jury the issue of the testifying defendant's credibility versus that of government witnesses and evidence, thereby increasing the need to impeach the defendant using prior convictions. Indeed, a defendant places his credibility directly at issue whenever he testifies and denies having

committed the charged offense.  See United States v. Alexander, 48 F.3d 1477 (9th Cir. 1995).  Thus, regardless of the substance of the defendant's testimony, once he places his version of the events before the jury, his credibility becomes central to the jury's determination of the case.  To permit the defendant to take the stand and appear "pristine" would be "unfair and misleading to the jury."  United States v. Ortiz, 553 F.2d 782, 785 (2d Cir. 1977).

Here, the government should be permitted to introduce evidence of the convictions described above during cross-examination should one of these defendants testify at trial.  The government addresses each defendant's prior convictions in turn.

1.    Bailey

Bailey has three prior felony convictions that the government would seek to introduce at trial should Bailey take the stand in his own defense, as these convictions inherently exhibit a willingness to break the rules and to operate in a furtive and evasive manner.  With respect to all three felonies, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully."  Estrada, 430 F.3d at 617.  Further, the convictions involve dishonest and deceptive behavior that bears strongly on credibility — bail jumping, possession of a forged instrument and assuming another's identity.  See Payton, 159 F.3d at 57 (finding defendant's acquisition of food stamps by deceit as conduct that arises out of the making of a false statement, falling within the categories of crimes contemplated by Rule 609(a)(2)).

All five factors weigh in favor of permitting inquiry on each of these three convictions.  With respect to the first factor, the impeachment value of the prior crime, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity

44

to testify truthfully." Estrada, 430 F.3d at 617. Moreover, "as the Second Circuit has

recognized, 'the gravity of an offense may bear on truthfulness, to the extent that more

serious offenses indicate a stronger willingness to ignore the law.'" United States v. White,

No. 08-CR-682 (NGG), 2009 WL 4730234, at *4 (E.D.N.Y. Dec. 4, 2009) (quoting Estrada,

430 F.3d at 618). Here, Bailey's conviction for bail jumping "suggests [the defendant's]

willingness to ignore the law." Id. And Bailey's convictions for forgery and identity theft

involve the kinds of deception that are the hallmark of allowable impeachment material. In

short, each conviction indicates Bailey's fundamental refusal to abide by the rules.

       The second factor, the date of the convictions and the defendant's subsequent

history, also ultimately weighs in favor of admission. Bailey's convictions for bail jumping

and forgery occurred close in time to the conduct charged here. See Fed. R. Evid. 609(b).

Although the 2011 felony conviction for identity theft is more than ten years' old, Bailey's

subsequent felony convictions for forgery and bail jumping demonstrate repeated acts

involving deceit and dishonesty, all of which bear heavily on his credibility. See Alexander,

48 F.3d at 1489 (finding it "not surprising that the [district] court was unwilling to let a man

with a substantial criminal history misrepresent himself to the jury, with the government

forced to sit silently by, looking at a criminal record which, if made known, would give the

jury a more comprehensive view of the trustworthiness of the defendant as a witness"); see

also United States v. Dismuke, No. 07-CR-81, 2007 WL 3342548, at *2 (E.D. Wis. Nov. 7,

2007) ("Although the 1998 conviction was nearly ten years old, defendant's subsequent

history, which included the three additional felony convictions, supported admission.").

Indeed, the defendant was serving his sentence for the 2011 conviction — five years'

probation — when he was arrested for the crimes to which he pleaded guilty in 2015,

indicating that the defendant did not commit himself to becoming a law-abiding citizen following the first felony conviction.

The third factor, dissimilarity to the current crime, also tends towards admission here because Bailey's crimes are significantly unlike the racketeering and firearms-related offenses charged here, leaving little risk of suggesting propensity.

The fourth and fifth factors — the importance of Bailey's testimony and the centrality of the credibility issue — also weigh in favor of the government.  Should the defendant testify and disclaim his participation in the charged offense, then his credibility versus that of the government witnesses will be central to the jury's determination.  This weighs strongly in favor of permitting inquiry into the crimes set forth above, which constitute only some of the defendant's criminal convictions.  See, e.g., Ortiz, 553 F.2d at 785 (holding that where the case is "narrowed to the credibility of two persons the accused and his accuser . . . there is greater, not less, compelling reason for exploring all avenues which would shed light on which of the two witnesses is to be believed" (internal quotation marks omitted)).  As the Second Circuit has explained, a defendant "has no right to avoid cross examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him." Payton, 159 F.3d at 58.

2.   Battice

Battice has five prior felony convictions and two prior misdemeanor convictions, and the government should be permitted to cross-examine him on all seven. First, four of Battice's felony convictions took place from 2015 and 2018, and his two misdemeanor convictions took place in 2016.  These convictions should be admitted if Battice were to testify at trial because each is less than ten years' old and evinces deceitful

46

conduct — namely, counterfeiting United States currency, making false statements, access device fraud, furnishing false identification information, grand larceny and eluding police. Like Bailey's convictions, these convictions are for sufficiently dissimilar conduct to the crimes charged here and the government expects that any testimony Battice may offer in his defense would directly pit his credibility against that of government witnesses and evidence.

As for Battice's seventh conviction — his 2008 felony robbery conviction involving a firearm — Rule 609(b) applies because it is more than ten years' old.  The defendant's prior robbery clearly satisfies requirements of Rule 609(b).  First, with respect to its impeachment value, courts in this Circuit routinely permit cross-examination concerning a defendant's previous participation in a robbery under Rule 609(a)(1)(B), on the ground that such an act bears on a defendant's credibility.  See, e.g., United States v. Steele, 216 F. Supp. 3d 317 (S.D.N.Y. 2016); Crenshaw v. Herbert, 409 F. App'x 428, 431-32 (2d Cir. 2011) ("Evidence of Crenshaw's prior robbery was probative of his veracity . . . the district court did not abuse its discretion in determining that the probative value of Crenshaw's prior robbery conviction was not substantially outweighed by the danger of unfair prejudice.").  Indeed, "[r]obberies by their very nature involve dishonesty and thus have an impact on the integrity and credibility of a witness.  United States v. Stevens, No. 03-CR669 (JFK), 2004 WL 2002978, at *3 (S.D.N.Y. Sept. 7, 2004) ("The probative value of admitting any robbery conviction, or attempted robbery conviction 'outweighs its prejudicial effect to the accused.'").  If Battice chooses to testify, the fact that he has previously been convicted of a robbery, which also involved displaying a firearm, would be relevant to the jury's determination of the defendant's character for truthfulness.  Or, if Battice claims he was merely someone in the wrong place at the wrong time, the fact that Battice has previously

47

been convicted of a crime dishonesty, trickery and deceit, would be relevant to the jury's consideration as to crediting his testimony.

Although the prior robbery occurred more than fifteen years ago, that conviction was soon followed by the defendant's 2015 convictions and imprisonment for attempted grand larceny and eluding police, which were soon followed by his misdemeanor convictions for access device fraud and furnishing false information, which were soon followed by Battice's felony convictions and imprisonment for counterfeiting U.S. currency and making false statements.  Thus, the defendant has largely been in and out of prison since the robbery, and so the passage of time does not accurately reflect a change in the defendant's behavior or indicate that he has conformed to a more law-abiding life.  His numerous subsequent convictions in fact indicate the opposite.

The third factor also weighs in favor of admission because, while the robbery conviction and the instant charges both involve a firearm, the instant charges relate to racketeering-related shootings and not to robbery.

For the reasons already discussed in connection with Battice's other convictions, as well as Bailey's convictions, the fourth and fifth factors — the importance of Battice's testimony and the centrality of his credibility — also weigh in favor of the government.

### 3. Brown

Brown has three prior felony convictions and one prior misdemeanor conviction, and the government should be permitted to cross-examine him on all four.  These convictions should be admitted if Brown were to testify at trial because each is less than ten years' old and evinces deceitful conduct — issuing bad checks, larceny, racketeering

48

conspiracy involving bank fraud and possession of a forged instrument.  In addition, each

conviction is for sufficiently dissimilar conduct to the crimes charged here.  Whereas

Brown's prior racketeering conviction may appear similar to the charges brought in this case,

his prior conviction involves bank fraud and this case does not.  Any potential prejudice that

nevertheless may be presented by introducing this conviction may be addressed by a limiting

instruction to the jury explaining the limited purpose for which the government offers the

prior racketeering conviction.  Finally, the government expects that any testimony Brown

may offer in his defense would directly pit his credibility against that of government

witnesses and evidence.  In light of these reasons, the Court should admit these convictions

as probative of Brown's credibility on cross-examination.

        4.    <u>Fremont</u>

        Fremont has two prior felony convictions and one prior misdemeanor

conviction, and the government should be permitted to cross-examine him on each.  These

convictions should be admitted if Fremont were to testify at trial because each is less than ten

years' old and evinces deceitful conduct.  For instance, should Fremont take the stand and

disclaim any involvement with guns, his prior felony and misdemeanor firearms convictions

would bear strongly on his credibility.  Moreover, these crimes, as well as the defendant's

felony conspiracy convictions, are all serious crimes which further counsels in favor of

inquiry.  <u>See</u> <u>White</u>, 2009 WL 4730234, at *4 ("[A]s the Second Circuit has recognized, 'the

gravity of an offense may bear on truthfulness, to the extent that more serious offenses

indicate a stronger willingness to ignore the law.'" (quoting <u>Estrada</u>, 430 F.3d at 618)).

Although this case, like Fremont's prior convictions, involves guns, that fact alone does not

render his prior convictions too similar to the instant case such that there is a risk of unfair

prejudice.  See, e.g., White, 2009 WL 4730234, at *4 (admitting, in a felon in possession of a firearm case, the name of the offense, the date, and the sentence of previous robbery conviction for impeachment purposes); see also United States v. Thomas, 214 F. Supp. 3d 187, 196 (E.D.N.Y.) (same).  In fact, the instant offense with which the defendant is charged is far more serious than his prior felony convictions, further reducing any chance of unwarranted prejudice.  Cf. United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (holding that evidence introduced pursuant to Fed. R. Evid. 404(b) is not unfairly prejudicial when it "[does] not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged").  Finally, the government expects that any testimony Fremont may offer in his defense would directly pit his credibility against that of government witnesses and evidence.  In light of these reasons, the Court should admit these convictions as probative of Fremont's credibility on cross-examination.

   For these reasons, the proposed cross-examination based on prior convictions should be permitted.

## V. Anonymous Jury

   For the reasons set forth below, the Court should empanel an anonymous jury and not allow disclosure to any of the parties of the names, precise addresses and workplaces of members of both the venire and the selected jury.

### A. Applicable Law

   The Second Circuit has repeatedly upheld the use of anonymous juries where there is reason to believe that the jury needs protection, and reasonable precautions have been taken to minimize any adverse effects on the juror's opinion of the defendant.  See, e.g., United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); United States v. Pica, 692 F.3d

79, 81 (2d Cir. 2012); United States v. Quinones, 511 F.3d 289, 291 (2d Cir. 2007); United

States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102,

1116 (2d Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United

States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251,

1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); United

States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d

236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United

States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359,

1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

   The Second Circuit has adopted a two-step process for district courts to follow

in connection with empaneling an anonymous jury.  A district court should first determine

whether there is strong reason to believe that the jury needs protection.  If there is, the court

should then take reasonable precautions to minimize any prejudice that might arise from an

anonymous jury.  See Paccione, 949 F.2d at 1192.  Importantly, "the use of an anonymous

jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir

dire designed to uncover any bias as to the issues or the defendant[] and takes care to give the

jurors a plausible and nonprejudicial reason for not disclosing their identities."  Aulicino, 44

F.3d at 1116.  Thus, "the decision whether or not to empanel an anonymous jury is left to the

district court's discretion."  Paccione, 949 F.2d at 1192.

   Courts in this circuit have considered various factors to determine whether

there is reason to believe the jury's safety and impartiality needs protection: (1) the

dangerousness of the defendant, (2) whether the defendant or his associates have engaged in

past attempts to interfere with the judicial process, (3) whether the defendant has access to

the means to harm the jury, and (4) whether the trial is likely to attract media attention and publicity.  See United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (citing Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132-33 (2d Cir. 1989)).  Notably, all of these factors need not be present; "anonymity is appropriate when some combination of these factors is present."  United States v. Ashburn, 13-CR-303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014).

Two procedures adequately protect a defendant's right to an unbiased jury during the use of an anonymous jury.  First, the court should "conduct a voir dire designed to uncover bias as to issues in the case[ ] and as to the defendant himself."  Paccione, 949 F.2d at 1192.  Second, to reduce the possibility that the jury will infer that the defendant is dangerous, the court should give the jurors "a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures."  Paccione, 949 F.2d at 1192; see also Aulicino, 44 F.3d at 1116.  In many cases, courts instruct the jury that the additional safeguards are to protect against intrusion by the media.  See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1191-92; Thomas, 757 F.2d at 1363.

B.    Analysis

Applying the standards and considering the factors set forth above, it is clear the interests of justice would best be served in this case by protecting the identities of the jurors.  Most importantly, the defendants are dangerous and, based on the evidence to be presented at trial, they are likely to be perceived by the jurors as dangerous.

As set forth above, the trial evidence will depict a pattern of violence by the defendants and fellow members of GD.  All but one of the charges in this case are crimes of violence.  Specifically, each of the defendants is charged in specific predicate acts involving

52

attempted murder or assault in-aid-of racketeering, namely, engaging in shootings targeting

other individuals.  Indeed, most of the defendants are charged in connection with four

shootings in which the defendants opened fire in crowded areas of Brooklyn, New York,

usually in broad daylight, without regard for the grave risk posed to innocent bystanders.

 These acts of violence charged against the defendants are exactly the type of

senseless violence that "would cause a juror to reasonably fear for his own safety."  <u>Vario</u>,

943 F.2d at 241.  In <u>Barnes</u>, the Second Circuit explained one of the important reasons for

empanelling anonymous juries in cases like this:

> If a juror feels that he and his family may be subjected to violence
> or death at the hands of a defendant or his friends, how can his
> judgment be as free and impartial as the Constitution requires?  If
> the anonymous juror feels less pressure as a result of anonymity,
> . . . this is as it should be — a factor contributing to his
> impartiality.

604 F.2d at 140-41 (affirming district court's use of an anonymous, sequestered jury because

it "comported with its obligation to protect the jury, to assure its privacy, and to avoid all

possible mental blocks against impartiality").

 Similarly, in <u>Thomas</u>, the Second Circuit found that the protection of jurors is

vital to the function of the criminal justice system and further articulated the importance of

using jury anonymity as a mechanism to ensure a jury's fair and impartial verdict free from

fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their
> chances" on what might happen to them as a result of a guilty
> verdict.  Obviously, explicit threats to jurors or their families or
> even a general fear of retaliation could well affect the jury's
> ability to render a fair and impartial verdict.

757 F.2d at 1364.

In this case, the jurors will be confronted with evidence that the defendants demonstrated callousness and brutality in participating in the charged crimes.  If the defendants had so little regard for human life as to fire a gun into groups of people, the jurors (if their identities are disclosed) will be left to wonder what the defendants and their criminal associates would be willing to do to retaliate against them for their conviction and lengthy imprisonment.  See Barnes, 604 F.2d at 141 (allegations of "dangerous and unscrupulous conduct" and pretrial publicity supported withholding the names and addresses of jurors); see also Thomas, 757 F.2d at 1364 (history of violence — including "mob-style" killings — related directly to the issue of juror safety or fear of reprisal).  Thus, the serious nature of the charges and the "pattern of violence by the defendants and [their] associates such as would cause a juror to reasonably fear for his own safety" is alone sufficient to warrant an anonymous jury in this case.  Vario, 943 F.2d at 241.

In addition, the defendants are members of the NLC set of Folk Nation, an ongoing criminal enterprise.  Although the defendants are under pretrial detention, their criminal associates "are currently, and will be, at large at the time of the trial."  Wilson, 493 F. Supp. 2d at 400.  Finally, based on the nature of the charges, the upcoming trial is likely to attract significant media attention.

For all of these reasons, an anonymous jury is warranted in this case.

C.     An Anonymous Jury Will Not Prejudice the Defendants

In this case, the government requests only that the names, precise addresses and workplaces of members of both the venire and the final jury not be revealed.  This will not burden the defendants' ability to make informed choices during jury selection because — apart from referring to jurors by their numbers (instead of their names) and limiting questions

54

about their residence and employment to avoid identification of specific addresses and locations — the voir dire can proceed as it would in a typical case.

Although a defendant has the right to a meaningful voir dire of potential jurors, see Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981), the decision as to the questions to be asked in voir dire largely rests within the informed discretion of the trial court.  See United States v. Silva, 715 F.2d 43, 50 (2d Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed), overruled on other grounds by United States v. FNU LNU, 653 F.3d 144, 151 (2d Cir. 2011); Barnes, 604 F.2d at 140 ("As long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.").  Indeed, "[t]he jury selection process (voir dire) is not a matter of constitutional dimension and the selection of an anonymous jury was implicitly held to be constitutional in Barnes."  United States v. Gotti, 777 F. Supp. 224, 227 (E.D.N.Y. 1991).

The information that will be kept from the parties and counsel if this motion is granted is not meaningful to the jury selection process.  Names, exact addresses and places of employment of the prospective jurors are not necessary to making an informed choice. Information regarding the neighborhoods in which the prospective jurors live and the nature of their work is sufficient.  The names of prospective jurors, to the extent they provide information about ethnicity, are not relevant to meaningful voir dire.  See Georgia v. McCollum, 505 U.S. 42, 55 (1992) (prohibiting use of peremptory challenges in racially discriminatory manner by criminal defendants).

Moreover, empaneling an anonymous jury will not diminish the defendants' presumption of innocence because jurors can receive an instruction from the Court explaining the measures imposed in a neutral way in order to prevent the jury from drawing any negative inference.  Most commonly, courts have explained to jurors that their privacy and their identities require protection from the media and the public. See, e.g., Thai, 29 F.3d at 801; Amuso, 21 F.3d at 1265; Tutino, 883 F.2d at 1133.  In some cases, the district court has explained the jury's partial anonymity by telling prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the personal questions asked in voir dire.

Accordingly, the government respectfully submits that the Court should empanel an anonymous jury and not allow disclosure of the names, precise addresses and workplaces of members of both the venire and the jury.

VI.    Business and Official Records Certifications

Finally, the government moves in limine to admit records from AT&T, T-Mobile, Sprint, Verizon, Facebook, Inc. and Apple, Inc. by business records certifications. The government has previously provided notice to the defendants of the specific records intended for use at trial, as well as copies of the relevant certifications, and it will provide any additional certifications upon receipt from the relevant entity.

As discussed above, the defendants and their co-conspirators all used their cellular telephones to communicate in the time period leading up to, during and after the November 7 and 9, 2020 shootings.  Accordingly, the government intends to introduce at trial the subscriber information, toll records, cell-site data and IMEI associated with those cellular telephones.  See, e.g., GD-PHONE RECORDS-SENSITIVE-000015, 16, 25, 26, 29,

31, 32, 43, 48, 49, 52, 53, 55, 57, 61, 62, 63,65, 66, 67, 76, 77, 78, 79, 89, 90, 91, 96, 97, 98, 99.   The subscriber records from Apple Inc. and Facebook, Inc. are also relevant to prove the defendants' identity and phone numbers, and material found stored in Apple and Facebook records include photographs of the defendants together, photographs or videos of defendants wearing clothes from the shootings, and communications among the defendants. See, e.g., GD-SOCIAL MEDIA-SENSITIVE-000001, 2, 15-19, 74, 86-89, 95, 96, 101, 124, 157, 158, 159.

The government also intends to offer excerpts of DMV records for Agoro, Destine, Hepburn, Lima, Moise, and Thompson, which include, but are not limited to including photographs, prior applications including addresses and phone numbers information, and prior address records.  See, e.g., GD-VEHICLES-SENSITIVE-000083-306, 365-394.  The government expects that these records will be relevant to prove co-conspirators' identities, telephone numbers, and home addresses (which are, in turn, relevant to prove the defendants' use of certain telephone numbers when combined with subscriber information for those phone numbers and IMEI).  All of these records are public records that bear both a DMV seal and signature of the Commissioner of Motor Vehicles certifying that the records are true and complete copies of records on file with the DMV.

The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation. See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial."  Id. at 324.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005).  As the Seventh Circuit explained in Ellis, an authenticating certification under Rule 902(11) is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record." 460 F.3d at 927.  It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business records by certification and sets forth specific requirements for their admission.  Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification.  Similarly, Title 18, United States Code, Section 3505 expressly permits the authentication of foreign business records by certification.  And courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial.  See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming district court decision to allow government to offer into evidence foreign business records based upon a certification, absent a live witness to authenticate the documents).

The government should be permitted to authenticate and admit the AT&T, T-Mobile, Sprint, Verizon, Apple, Inc., Facebook, Inc., and DMV records and other business records using certifications because it is proper under the law.  In addition, such a process would eliminate unnecessary persons from the courtroom, shorten the amount of time that jurors will need to sit for trial, and ensure that witnesses who may reside outside New York need not travel to New York to appear at trial which is an efficiency that is particularly important in light of ongoing concerns about COVID-19.  Accordingly, the government seeks a pretrial ruling that these records may properly be authenticated as self-authenticating public records.  See Fed. R. Evid. 902(1).

CONCLUSION

For the reasons set forth above, the government's motions in limine should be

granted.

Dated:    Brooklyn, New York
          September 9, 2022

                              Respectfully submitted,

                              BREON PEACE
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


                    By:    _____/s/_____

                              Jonathan Siegel
                              Dana Rehnquist
                              Sophia Suarez
                              Assistant United States Attorneys
                              (718) 254-7000

cc:    Clerk of the Court (WFK) (by ECF)
       Defense Counsel (by ECF)